UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SOLESTER D. JOHNSON,                                )
                                                    )
                    Plaintiff,                      )
                                                    )
        v.                                          )
                                                    )
SALEH OBAISI, M.D., JENNIFER                        )        No.  16 cv 4046
ENCARNACION, R.N., CNII, LORNA ANDERS,              )
CMT, LPN, DARRISE HARDY, LPN, EVARISTO              )        Judge Rebecca R. Pallmeyer
AGUINALDO, M.D., and WEXFORD HEALTH                 )
SOURCES, INC.,                                      )
                                                    )
                    Defendants.[1]                  )

## MEMORANDUM ORDER AND OPINION

Plaintiff Solester Johnson alleges that he had tuberculosis that was not treated during

seven weeks while Johnson was detained at the Stateville Northern Reception Center ("Stateville

NRC").  As a result, Plaintiff claims that Defendants Dr. Evaristo Aguinaldo, Nurse Lorna Anders,

and Wexford Health Sources, Inc. were deliberately indifferent to his serious medical needs in

violation of the Eighth Amendment.  *See* 42 U.S.C. § 1983.  The Defendants' motions for summary

judgment are now before the court.[2]  For the reasons explained below, Defendants' motions for

summary judgment [125, 126] are granted.

## BACKGROUND

Plaintiff was incarcerated at Stateville NRC for some seven weeks, from December 5,

2014 to January 22, 2015.  (Anders Rule 56.1 Statement of Facts ("Anders SOF") [129] ¶ 1.)  The

Stateville NRC is a processing center where inmates are housed temporarily while in transit from

---

[1]        Plaintiff Johnson voluntarily moved to dismiss Defendants Hardy and Encarnacion
on September 10, 2019 [133].  The court granted Plaintiff's motion on September 11, 2019 [134].
Defendant Obaisi is deceased and Defendant Wexford Health Sources, Inc. notified the court of
his death [88] pursuant to Federal Rule of Civil Procedure 25(a).  No one subsequently moved to
substitute Mr. Obaisi's executor as a defendant.  *See* FED. R. CIV. P. 25(a)(1).

[2]        Defendants Aguinaldo and Wexford filed a joint motion for summary judgment
[125] and Defendant Anders filed a separate motion [126].

jails to their final institutions. (Aguinaldo & Wexford Rule 56.1 Statement of Facts ("Aguinaldo & Wexford SOF") [128] ¶ 9.) Upon entering Stateville NRC on December 5, 2014, Plaintiff went through the intake process which included a skin test for tuberculosis ("TB"). (Anders SOF ¶ 2.) To test for tuberculosis, a purified protein derivative ("PPD") containing tuberculosis antigens is injected under the skin of a patient's forearm. (Aguinaldo & Wexford SOF ¶ 41.) After 48 to 72 hours, a reaction at the injection site—a raised bump measuring five millimeters or greater[3]— indicates a positive result. (*Id.*; Anders SOF ¶¶ 3–4.) Jennifer Encarnacion, formerly a nurse at Stateville NRC, administered Plaintiff's tuberculosis test on December 5. (Anders SOF ¶ 10.) Plaintiff testified that he told Nurse Encarnacion during the intake process that he had bumps on his chest, his chest hurt, and that he was not feeling well.[4] (Johnson Dep. 46:20–22, Ex. A to Pl.'s Am. Rule 56.1 Statement of Facts ("Pl.'s SOF") [135].) Plaintiff's medical records from intake make no mention that he reported any symptoms of illness. (*See* Ex. 2 to Encarnacion Dep. [128-1], Ex. A to Aguinaldo & Wexford SOF.)

I.    **Defendants' Conduct**

Plaintiff believes that no one ever read his PPD test to determine whether he tested positive for tuberculosis. (Johnson Dep. 51:22–53:4.) Plaintiff testified that he had a bad reaction to the tuberculosis test the next day; a large bump developed at the injection site, and the area around the injection site became red and itchy. (*Id.* at 47:8–24.) Stateville NRC's medical records show, in contrast, that Defendant Anders, a nurse who formerly worked at the Stateville NRC, recorded that Plaintiff had no reaction to the tuberculosis skin test on December 7, 2014,

---

3       The Illinois Department of Corrections ("IDOC") guidelines say that a reading of ten millimeters or greater indicates a positive result unless the individual is HIV positive, has had recent contact with someone with active tuberculosis, or has had an organ transplant; then a positive result is a reading of five millimeters or greater. (*See* Ex. 6 to Aguinaldo Dep, Ex. C to Aguinaldo & Wexford SOF.)

4       Plaintiff also testified that, on the day he entered the Stateville NRC, he had a chronic cough, chest pain, bumps on his chest, he was coughing up yellow phlegm, and he felt hot like he had a fever. (Johnson Dep. 38:8–40:15.) His testimony does not reflect, however, that he told Nurse Encarnacion about all of these symptoms.

indicating that he did not have tuberculosis. (*See* Ex. 2 to Encarnacion Dep.) In her deposition, Nurse Anders acknowledged that she had no specific memory of Plaintiff by name (Anders Dep. 22:9–12, Ex. C. to Pl.'s SOF), but she also testified that she has never made note in a medical record of having read a tuberculosis test when she had not actually done so, nor has she otherwise falsified a medical record. (*Id.* at 42:5–17.) Plaintiff testified that he experienced symptoms such as chest pain, fever, coughing up blood and phlegm, and shortness of breath while held at Stateville NRC. (Johnson Dep. 56:9–57:6.) Plaintiff asserts that he submitted to correctional officers a request for medical attention for these symptoms (*id.* at 57:7–24), but Stateville NRC has no record of such a complaint.[5] Plaintiff did not name the correctional officers as Defendants, nor has he said whether he ever received a response.[6]

Plaintiff had an appointment with Defendant Aguinaldo, a physician who worked at Stateville NRC from 2008 to 2016, on January 5, 2015. (Aguinaldo & Wexford SOF ¶¶ 10,12.) Dr. Aguinaldo was responsible for examining and treating patients at Stateville NRC. (*Id.* ¶ 11; Pl.'s SOF ¶ 37.) Dr. Aguinaldo was not involved in Plaintiff's intake examination and testified that he does not remember Plaintiff. (Aguinaldo Dep. 40:22–41:9; Pl.'s SOF ¶ 38.) Dr. Aguinaldo

---

[5]  Wexford's Rule 30(b)(6) deponent, Dr. Neil Fisher, testified that there was no record of Plaintiff's sick call request, but that generally, such requests are not kept in an inmate's medical records. (*See* Fisher Dep. 59:8–13; 63:24–25, Ex. F to Aguinaldo & Wexford SOF.) In contrast, Donald Mills, the IDOC's 30(b)(6) witness, testified that the sick call requests would be kept indefinitely in an inmate's medical records. (Mills Dep. 14:11–12, Ex. H to Aguinaldo & Wexford SOF.)

[6]  Johnson testified that his sick call request was submitted to a correctional officer, was not addressed to any specific member of the medical staff, and did not request to see a specific member of the medical staff. (Johnson Dep. 57:11–24.) In general, sick call slips are placed in a box kept near the cells, and a medical technician or nurse collects them. (Mills Dep. 12:16–20.) Plaintiff's factual submissions do not establish that Nurse Anders or Dr. Aguinaldo were responsible for ensuring that there was a prompt response to Plaintiff's sick call request, or to sick call requests generally. The court concludes that failure to respond to a sick call request is not a basis for finding Nurse Anders or Dr. Aguinaldo liable. *See Johnson v. Parker*, No. 15 CV 109, 2019 WL 3080930, at *2 (N.D. Ill. July 5, 2019); *see also Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) (explaining that "an individual must be personally responsible for a constitutional deprivation in order to be liable," and that "personal responsibility is not limited to those who participate in the act," but includes those who direct or know about the constitutional deprivation).

further testified that he never read the Illinois Department of Correction's tuberculosis protocol, and that he had never diagnosed nor treated a patient with tuberculosis. (Aguinaldo Dep. 36:6–37:5.) Dr. Aguinaldo stated that he does not review a patient's medical history prior to seeing the patient, but that he does review the patient's records during the appointment. (*Id.* at 50:12–19, 110:15–111:4.)

Plaintiff's appointment with Dr. Aguinaldo on January 5, 2015 was a physical exam scheduled prior to his transfer out of Stateville NRC; it was not in response to a sick call request. (Aguinaldo & Wexford SOF ¶ 12.) Plaintiff testified that he told Dr. Aguinaldo that he believed he had TB, but did not testify that he told Dr. Aguinaldo about any symptoms he was experiencing. (Johnson Dep. 60:5–11.) The medical record from this appointment has checks in the "no" boxes next to questions about whether Plaintiff was experiencing symptoms of illness, for example, fever, diarrhea, night sweats, weight loss, fatigue, or other symptoms of upper respiratory illness; nor does it reflect that Plaintiff believed he had tuberculosis. (Ex. 3 to Aguinaldo Dep.) The record also shows that the results of Plaintiff's physical exam were normal. (*Id.*) Plaintiff testified that by the time of his appointment with Dr. Aguinaldo, the bump on his arm "had [gone] down," but his arm was still red. (Johnson Dep. 59:10–24.) According to Plaintiff, Dr. Aguinaldo looked at Plaintiff's arm but did not do any tests. (*Id.* at 60:1–4.) Additionally, Plaintiff testified that Dr. Aguinaldo told him that he would be transferred to Jacksonville Correctional Center that morning, and that Dr. Aguinaldo would make sure Plaintiff received treatment for tuberculosis once he arrived there. (*Id.* at 60:8–11.) Dr. Aguinaldo did not recall saying this, and testified that he was never given specific information about inmate transfers. (Aguinaldo Dep. 107:22–108:21.) In fact, Plaintiff was transferred to Centralia Correctional Center ("Centralia") on January 22, 2016. (Pl.'s Resp. at 13.)

Wexford employs some of the medical professionals who provide care in Illinois corrections facilities. (Fisher Dep. 9:16–10:20.) Wexford has its own tuberculosis policy, but in Illinois, Wexford follows the administrative directives of the IDOC related to diagnosing and

treating inmates with tuberculosis. (Aguinaldo & Wexford SOF ¶¶ 48, 59.) Wexford has an orientation program for new employees so that medical providers at Stateville NRC "are familiar with the IDOC policies/directives for medical care." (*Id.* ¶ 46.) Wexford also created a continuing education document related to diagnosing and treating patients with tuberculosis that it made available to both Wexford and IDOC employees at Stateville NRC. (*Id.* ¶ 48.) Plaintiff disputes that orientation training was actually provided to Wexford employees, citing Dr. Aguinaldo's testimony that he never received training from Wexford about tuberculosis. (Pl.'s 56.1 Resp. [135-2] ¶ 46.)

## II.     Plaintiff's Diagnosis

Two types of tuberculosis are relevant to an assessment of Mr. Johnson's claims. An individual with active tuberculosis has an active infection, will experience symptoms of tuberculosis, and is contagious. (Aguinaldo & Wexford SOF ¶ 23.) An individual with latent tuberculosis has no symptoms and is not contagious, but will have a positive PPD (skin) test due to either prior exposure to tuberculosis, or an otherwise abnormal reaction to the test. (*Id.*) The symptoms of tuberculosis are non-specific, and include, among others, cough, fatigue, and fever. (*Id.* ¶ 26.) Thus, a patient who has latent tuberculosis may exhibit symptoms consistent with tuberculosis while actually having another illness. (*Id.*) Patients with a positive skin test usually receive a chest x-ray to determine whether they have active or latent tuberculosis. (*Id.* ¶ 25.) An x-ray showing infiltrates in the lung indicates active tuberculosis. (*Id.*) Plaintiff notes that Dr. Segreti, Defendants' expert witness and a physician experienced in diagnosing tuberculosis, testified that it is theoretically possible, but very rare, for a patient to have active tuberculosis but no infiltrates visible in a chest x-ray. (Segreti Dep. 21:12–18; 27:1–8, Ex. E to Aguinaldo & Wexford SOF.) A test for the presence of tuberculosis bacteria in a sputum sample is another way to determine whether a person with a positive skin test has active or latent tuberculosis. (*Id.* at 20:8–11.)

Dr. Segreti testified that both active and latent tuberculosis are treated with the same medications (generally Rifampin, Rifapentine, Isoniazid, Pyrazinamide, or Ethambutol). (*Id.* at 35:3–23.) The treatment differs, however, in duration and dosage. (*Id.*) A patient with active tuberculosis is generally treated with four drugs for the first two months, and then two drugs for four to seven additional months. (*Id.* at 35:5–13.) There are three equally effective treatment options for a patient with latent tuberculosis: Isoniazid for six to nine months, Rifampin for four months, or Rifapentine and Isoniazid together for twelve weeks. (*Id.* at 35:14–20.) Dr. Segreti further testified that if a patient with active tuberculosis were given the course of treatment for latent tuberculosis, he would likely relapse after stopping the drug or potentially while still taking it. (*Id.* at 36:3–7.) Moreover, he opined that although latent tuberculosis does not require immediate treatment, treatment is recommended to prevent future reactivation of tuberculosis. (*Id.* at 55:5–16.)

In March 2015, more than a month after his transfer to Centralia, Plaintiff received another skin test for tuberculosis. (Aguinaldo & Wexford SOF ¶ 40.) An April 2015 medical record from Centralia shows that this test came back positive (a ten-millimeter reading), but that a subsequent chest x-ray was negative for active pulmonary disease. (*See* Ex. 1 to Segreti Dep.) The medical record also shows that Plaintiff complained of a chronic cough, yellowish and occasionally blood-tinged sputum (phlegm), fatigue, weakness, night sweats, chest pain, and that he had a temperature of 99.9 degrees at the time of the appointment. (*Id.*) That record further reflects that Plaintiff said he initially lost weight but was gaining it back by the time of the appointment. (*Id.*) Plaintiff began treatment in April 2015: he was given Rifapentine and Isoniazid for twelve weeks (that is, the treatment appropriate for latent tuberculosis). (Segreti Dep. 35:14–20; Aguinaldo & Wexford SOF ¶ 40.) Plaintiff did not receive a sputum test to rule out active tuberculosis (Pl.'s SOF ¶ 15), but there is no indication in the record that Plaintiff has relapsed since being treated for latent tuberculosis. (Pl.'s 56.1 Resp. ¶ 29.)

6

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The court "view[s] the record in the light most favorable to [the nonmoving party], and draw[s] all inferences in his favor." *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). Rule 56(c), however, "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; FED. R. CIV. P. 56(c). In such situations, there is no issue for trial because a "dispute about a material fact is 'genuine'" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**DISCUSSION**

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners. U.S. CONST. amend. VIII. Because a prisoner "cannot by reason of the deprivation of his liberty, care for himself," the failure of prison authorities to provide adequate medical care may violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *see also DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) ("[W]hen the State . . . so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment."). This is because the denial of adequate medical care may cause "pain and suffering which no one suggests would serve any penological purpose." *Estelle*, 429 U.S. at 103.

The Eighth Amendment proscribes "deliberate indifference to serious medical needs of prisoners." *Id.* at 104. A deliberate indifference claim has both subjective and objective elements. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An inmate must show that, objectively, his

7

"medical need [ ] was sufficiently serious." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The subjective component of a deliberate indifference claim requires a plaintiff to show that prison authorities acted with a "sufficiently culpable state of mind." *Id.* (citing *Farmer*, 511 U.S. at 834). "[A]n inadvertent failure to provide adequate medical care" or a "complaint that a physician has been negligent in diagnosing or treating a medical condition" does not constitute "unnecessary and wanton infliction of pain" under the Eighth Amendment. *Gamble*, 429 U.S. at 105–06. An inmate need not, however, "establish that officials intended or desired the harm that transpired." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Rather, the officials must "know of and disregard an excessive risk to inmate health." *Id.*; *see also Petties*, 836 F.3d at 728.

## I.     Serious Medical Condition

A medical need is serious if it "has been diagnosed by a physician as mandating treatment," or "is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653. The condition need not be life-threatening, but must "result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Roe*, 631 F.3d at 857. The parties dispute whether Plaintiff had tuberculosis when he was held at Stateville NRC and further dispute whether Plaintiff, at any time while incarcerated, had active or latent tuberculosis. The court views the record here as sufficient to support a finding that Plaintiff had latent tuberculosis.

"No expert testimony is required to assist jurors in determining the cause of injuries that are within their common experience or observations." *Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009). For example, expert testimony is not needed for jurors to conclude that a beating by an officer at a prison facility exacerbated an inmate's back pain. *Id.* While a "witness does not need to be a doctor to discuss his or her health in general terms," *Collins v. Kibort*, 143 F.3d 331, 337 (7th Cir. 1998), Plaintiff testified that he was experiencing symptoms that he believes were caused by active tuberculosis, but the cause of his symptoms is a medical question. *See Wade v. Lain*, No. 2:11-CV-454-JVB, 2015 WL 6828851, at *6 (N.D. Ind. Nov. 6, 2015); *United States*

*v. Cravens*, 275 F.3d 637, 640 (7th Cir. 2001). Generally, establishing medical causation requires expert testimony because medical opinions regarding diagnoses require "scientific, technical, or other specialized knowledge" that lay witnesses do not possess. *McGown v. Arnold*, No. 1:13-CV-148, 2014 WL 5502612, at *7 (N.D. Ind. Oct. 30, 2014); *see also Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 821 (N.D. Ill. 2010); FED. R. EVID. 701. While Plaintiff testified to experiencing symptoms consistent with tuberculosis, the parties agree that the symptoms of tuberculosis are non-specific, that is, other conditions may cause the same symptoms as active tuberculosis. (Pl.'s 56.1 Resp. ¶ 26.) Plaintiff has not supported his contention that his symptoms were caused by active tuberculosis with expert testimony or medical records. "Without such a statement by a qualified expert, there is no basis for finding that Plaintiff had active [tuberculosis]." *Wade*, 2015 WL 6828851, at *6.

None of the tests done at Stateville NRC or Centralia supports a finding that Plaintiff had active tuberculosis. *See Wilson v. Adams*, 910 F.3d 816, 821 (7th Cir. 2018). Plaintiff claims that he tested positive for tuberculosis after his December 5, 2014 skin test (Pl.'s Resp. at 8), even though the results of that test, as record in his medical records, were all negative.[7] Even assuming that Plaintiff's skin test was positive, his expert acknowledged that there is no way to know from a positive PPD test alone whether a patient has active or latent tuberculosis. (Reagan Dep. 66:6–9.) Accordingly, a patient with a positive skin test and non-specific symptoms could have active or latent tuberculosis. Moreover, Plaintiff's medical records from Centralia record that his chest x-ray showed that he did not have active tuberculosis.[8] (Pl.'s SOF ¶ 15; Ex. 1 to Segreti Dep.)

---

[7]    Plaintiff alleges that a Stateville NRC correctional officer named Will told him on December 6, 2014 that it looked like he tested positive for tuberculosis. (Pl.'s SOF ¶ 6.) It is not clear that a correctional officer would have a basis for making such a determination; in any event, what Will told Plaintiff is hearsay. *See* FED. R. EVID. 801(c).

[8]    There is some evidence in the record that Plaintiff's chest x-ray taken at Centralia showed pleural fibrosis (scarring on the lung). (*See* Pl.'s 56.1 Resp. ¶¶ 30–31; Pl.'s SOF ¶ 15; Segreti Report at 2, Ex. G to Pl.'s SOF.) Dr. Segreti testified that someone with reactivated tuberculosis may have pleural fibrosis, but it is unlikely that a person with reactivated tuberculosis would have pleural fibrosis but not infiltrates in their lungs (as occurred with Plaintiff). (Segreti

Plaintiff argues that there is nevertheless a genuine issue of material fact regarding whether he in fact had active tuberculosis because no one definitively ruled it out. (Pl.'s Resp. at 8.) Plaintiff further argues that active tuberculosis may be misdiagnosed as latent tuberculosis even in cases of a negative chest x-ray. (*Id.* at 9.) Dr. Segreti explained that there are two ways to determine whether a patient with a positive skin test has active or latent tuberculosis. First, if the patient's symptoms improve without treatment or, second, if there is no evidence of tuberculosis in a sputum test. (Segreti Dep. 23:6–24:2.) Plaintiff's sputum was never tested for tuberculosis, and he was eventually treated for tuberculosis. (Pl.'s Resp. at 8.) The treatment he received, however, was for latent tuberculosis (Pl.'s 56.1 Resp. ¶ 28), and Dr. Segreti testified that the treatment for latent tuberculosis is inadequate to treat active tuberculosis; a patient suffering from active tuberculosis but treated only for latent tuberculosis would relapse. (Segreti Dep. 49:16–50:3.) Plaintiff provided no evidence to dispute this testimony. (*See* Pl.'s 56.1 Resp. ¶ 29.) In sum, Plaintiff has offered no evidence to show that he in fact had active tuberculosis.[9]

The court assumes that while he was at Stateville NRC, Plaintiff had latent, rather than active, tuberculosis, and that his condition was objectively serious. *See Greeno*, 414 F.3d at 653; *see also McRoy v. Sheahan*, 383 F. Supp. 2d 1010, 1014 (N.D. Ill. 2005), *aff'd* 188 F. App'x 523 ("We must for the purposes of this summary judgment motion assume that latent tuberculosis is a serious medical need that requires treatment."); *Satterwhite v. Dy*, No. C11-0528-JCC, 2013 WL 257420, at *11 (W.D. Wash. Jan. 23, 2013) ("[S]ociety's attitude had evolved to the point that involuntary exposure to the risk of progressing from [latent] to active tuberculosis disease violated

---

Dep. 39:10–40:13.) Segreti further testified that a patient with a positive skin test, but an x-ray showing scarring and no infiltrates, likely has latent tuberculosis. (*Id.*) Plaintiff has pointed to no medical evidence that suggests otherwise.

[9] Plaintiff does not cite the report of his expert witness, Joann Reagan, a registered nurse, with good reason. Nurse Reagan acknowledged that she is not authorized to offer a diagnosis (Reagan Dep. 63:17–19, Ex. G to Aguinaldo & Wexford SOF), and that the basis for her testimony that Plaintiff had active tuberculosis while at Stateville NRC was limited to Plaintiff's own analysis of his test results and Plaintiff's testimony about symptoms that are not reflected in the medical records. (*Id.* at 46:14–23; 65:4–6; 65:21–22; 84:13–20.)

current standards of decency."). *But see Ramey v. Velasco, Chin, Edwards, Puller & Lyles*, No. 99 C 1365, 2004 WL 2973838, at *3 (N.D. Ill. Dec. 1, 2004) (explaining that "it is questionable whether [Plaintiff's] having tested positive for [tuberculosis] is even a serious medical condition" when "it was clear that [Plaintiff] never contracted tuberculosis in the jail"). The court turns to the question of whether Defendants were deliberately indifferent to his medical needs.

## II.     Defendant Aguinaldo

Plaintiff argues that Defendant Aguinaldo was deliberately indifferent to his medical needs because Dr. Aguinaldo failed to diagnose and treat Plaintiff for tuberculosis. The subjective component of the deliberate indifference standard requires that Dr. Aguinaldo knew of and disregarded an "excessive risk" to Plaintiff's health. *Greeno*, 414 F.3d at 653. Additionally, if Dr. Aguinaldo acted with deliberate indifference, he may be held liable under § 1983 only if his deliberate indifference to Plaintiff's serious medical need harmed Plaintiff. *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) ("[T]here is no tort—common law, statutory, or constitutional— without an injury, actual or at least probabilistic."). It is undisputed that Dr. Aguinaldo did not treat Plaintiff for latent tuberculosis, and that although he was not treated at Stateville NRC, Plaintiff was ultimately treated for latent TB at Centralia. Because Plaintiff was ultimately treated, the issue before the court is one of delay, not denial, of medical treatment. *See McRoy*, 383 F. Supp. 2d at 1014.

### A.     Subjective Indifference

Medical malpractice, by itself, does not violate the Eighth Amendment. *See Estelle*, 429 U.S. at 106. Rather, a prisoner's Eighth Amendment right is violated only when the treatment he receives is "blatantly inappropriate." *Greeno*, 414 F.3d at 654. A prisoner with a serious medical need receives blatantly inappropriate treatment if he is "literally ignored," *Roe*, 631 F.3d at 858, or if the treatment he does receive is such that "no minimally competent professional would have so responded under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019). That is, a

court "will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.* (citing *Roe*, 631 F.3d at 857).

Failure to correctly diagnose a patient may reflect negligence, but that failure, without more, does not violate the Constitution. *See Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428 (7th Cir. 1991) (explaining that "mere" carelessness in diagnosis and treatment may rise to the level of malpractice, but not an Eighth Amendment violation). For example, in *Harvey v. Illinois Department of Corrections*, the plaintiff was allegedly incorrectly diagnosed as having tuberculosis and, as a result, was left untreated for his true ailments, allegedly including high blood pressure, chronic obstructive pulmonary disease, a heart condition, a prostate issue, and possible diabetes. No. Civ. 04-591-DRH, 2005 WL 1594551, at *1 (S.D. Ill. July 5, 2005). The court found that this amounted to, at most, "a claim of medical negligence." *Id.* at *3. Similarly, in *Gutierrez*, a doctor who initially failed to realize that the plaintiff had an infected cyst, and so recommended only hot baths (only later ordering antibiotics and sitz baths), was not deliberately indifferent to the plaintiff's medical needs. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997).

Plaintiff's claim against Dr. Aguinaldo is, essentially, that Dr. Aguinaldo incorrectly concluded that Plaintiff did not have tuberculosis, and so improperly failed to order treatment. Plaintiff, however, has failed to raise a genuine issue of material fact that would preclude summary judgment in favor of Dr. Aguinaldo. Viewing the record in the light most favorable to Plaintiff, the evidence in the record tending to show what Dr. Aguinaldo knew about Plaintiff's condition at the time of their appointment does not support a finding that "no minimally competent professional" would have responded similarly under the circumstances. *Pyles*, 771 F.3d at 409. As described in the Background Section, above, the record shows that Plaintiff told Dr. Aguinaldo that he believed he had tuberculosis and that Dr. Aguinaldo examined the site of the PPD injection on Plaintiff's arm but conducted no further tests. Plaintiff testified that the swelling at the site of the

PPD test had gone down, but that his arm remained red; but there is no evidence that redness at the site of a PPD test, without more, requires the conclusion that treatment for TB is warranted.[10] The records from Plaintiff's appointment with Dr. Aguinaldo show a normal physical examination and that Plaintiff did not report or display any symptoms of illness. (Ex. 3 to Aguinaldo Dep.) Moreover, Plaintiff himself testified that Dr. Aguinaldo told Plaintiff he was about to be transferred, and assured Plaintiff that he (Aguinaldo) would ensure Plaintiff received treatment for tuberculosis after his transfer to another facility that morning.

Dr. Aguinaldo was not acting with deliberate indifference by choosing to rely on a patient's medical records and his own examination rather than a patient's self-diagnosis when assessing that patient's condition, even if his conclusion that no follow-up treatment was needed was incorrect. *See Gutierrez*, 111 F.3d at 1364 ("[M]edical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim."). And while a reasonable jury could alternatively conclude that Dr. Aguinaldo ignored indications that additional assessments were needed to determine whether Plaintiff should be treated for tuberculosis, this case is distinguishable from others finding medical providers deliberately indifferent for inexplicable delays in treatment. *See, e.g., Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (reversing summary judgment in favor of a doctor who did not refer the plaintiff to a dentist despite his repeated complaints of dental pain; a "jury could find that [the doctor] simply concluded that [plaintiff] could endure his pain until his transfer . . . several weeks later, when [plaintiff] would be the DOC dentist's problem, not hers"). Plaintiff believes Dr. Aguinaldo thought Plaintiff was being transferred out of Stateville NRC that same day (he in fact remained at Stateville for three more

---

[10] Dr. Segreti and Nurse Reagan both testified that skin redness at the site of a PPD test may be consistent with a positive result, but that the only measure of a positive PPD test is the size of the swelling. (Reagan Dep. 38:23–39:7; Segreti Dep. 80:11–81:3.) Dr. Segreti further testified that it would be "very atypical" for a bump from a PPD test to last for one month. (Segreti Dep. 84:4–11.) Rather, Dr. Segreti suggested that a bump and redness lasting for so long is more indicative of "an allergic reaction to the PPD" or a secondary infection from scratching the injection site. (Id.)

weeks). If Dr. Aguinaldo did believe Plaintiff was about to be transferred, then alerting medical

providers at the new facility to a potential need for tuberculosis treatment was (as far as the record

shows) Dr. Aguinaldo's only option to address Plaintiff's complaints aside from his brief

examination of Plaintiff's arm. Additionally, there is no evidence in the record showing that Plaintiff

requested further medical treatment, or otherwise complained of symptoms to Stateville NRC

personnel, after his appointment with Dr. Aguinaldo but before his transfer to Centralia. In sum,

Plaintiff has failed to raise a genuine issue of material fact regarding whether Dr. Aguinaldo was

deliberately indifferent to his serious medical needs. Moreover, as discussed below, Plaintiff has

not offered evidence that any brief delay in treating his condition resulted in harm.

### B. Evidence of Harm

"The decision of a medical professional to do nothing, even though she knows that a

patient has a serious medical condition requiring prompt treatment that the professional is capable

of and responsible for providing, amounts to deliberate indifference." *Dobbey v. Mitchell-*

*Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015). But a delay in medical treatment constitutes an

Eighth Amendment violation only if the delay was "objectively, sufficiently serious" enough to

constitute the "denial of the minimal civilized measures of life's necessities." *Langston v. Peters*,

100 F.3d 1235, 1240 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 835). In this Circuit, to succeed

on a claim of delayed treatment, a plaintiff must place in the record "verifying medical evidence"

that "establish[es] the detrimental effect of the delay in medical treatment." *Walker v. Benjamin*,

293 F.3d 1030, 1038 (7th Cir. 2002) (quoting *Langston*, 100 F.3d at 1240). That is, the verifying

medical evidence must show that "the delay (rather than the inmate's underlying condition)

caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). The Seventh

Circuit has explained that "expert testimony that the Plaintiff suffered because of a delay in

treatment" qualifies as verifying medical evidence. *Grieveson v. Anderson*, 538 F.3d 763, 779

(7th Cir. 2008) (quoting *Williams*, 491 F.3d at 715). Evidence, such as a medical record, "of a

plaintiff's diagnosis and treatment, standing alone," on the other hand, "is insufficient if it does not

assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him." *Id.* Thus, for example, medical records that after a nasal fracture from an assault, plaintiff "could experience further bleeding" and "may need to see a specialist," and evidence that the plaintiff "underwent painful nose surgery" could support a jury finding that the delay prolonged his pain. *Grieveson*, 538 F.3d at 779. *Id.* In *Williams*, the plaintiff's medical records and expert testimony "showed that when [plaintiff] arrived at the hospital, he had elevated blood pressure, had an abnormal EKG, was sweating, and complained of severe pain." *Williams*, 491 F.3d at 715. That evidence, coupled with medical records showing that plaintiff's symptoms "quickly subsided" with treatment, could support a finding that delay "unnecessarily prolonged and exacerbated" his condition. *Id.* at 715–16.

Plaintiff has provided no verifying medical evidence that would permit a jury finding that any delay in his medical treatment attributable to Dr. Aguinaldo was detrimental. Plaintiff's expert, Nurse Reagan, testified that the "delay of treatment caused Mr. Johnson to unnecessarily suffer from chest pain, weakness, fatigue, chronic cough and weight loss," but she could not rule out other potential causes of these symptoms (to which Plaintiff testified, but which are not reflected in his medical records).[11] (Reagan Dep. 61:5–20.) Plaintiff's own testimony that he experienced untreated symptoms during the delay does not qualify as verifying medical evidence. As discussed above, Plaintiff has not provided evidence showing that he had active tuberculosis while at Stateville NRC, and the fact that he was treated successfully for latent tuberculosis at Centralia confirms that his disease was not active. Plaintiff did complain of symptoms during a medical appointment at Centralia in April 2015, but it is not clear that the symptoms reflected in the medical record were associated with latent tuberculosis, which does not cause symptoms.

---

[11]     Plaintiff's medical records show, for example, that he was diagnosed with a sebaceous cyst at a medical visit scheduled in response to complaints of chest pain (Segreti Dep. 59:8–12; Ex. 3 to Segreti Dep.), and Plaintiff's expert, Nurse Reagan, could not conclude that Plaintiff's chest pain was caused by tuberculosis, rather than a prior gunshot wound to his chest. (Reagan Dep. 58:12–17.)

And if they were associated with latent TB, those symptoms could not be the result of a delay attributable to Dr. Aguinaldo, who did not work at Centralia and had no ability to influence that institution's treatment decisions. (Aguinaldo Dep. 108:22-109:2.) Without evidence that any delay in treatment for latent tuberculosis attributable to Dr. Aguinaldo was detrimental, Plaintiff has not identified a genuine issue of material fact that would preclude summary judgment in favor of Defendant Aguinaldo.

**III.     Defendant Anders**

In his response brief, Plaintiff contends that Nurse Anders failed to accurately read or transcribe his tuberculosis test result in December 2014. (*See* Pl.'s Resp. [135-3] at 14.) In his deposition, however, Plaintiff testified that no one looked at his arm after the tuberculosis test to determine if he tested positive. (Johnson Dep. 51:22–53:4.) In either case, summary judgment in favor of Defendant Anders is appropriate.

The court recognizes the parties' stipulation that Nurse Anders did not have the authority to diagnose patients, but in this context, the failure to correctly read or transcribe a tuberculosis test is analogous to a mis-diagnosis. As discussed above, the failure to correctly diagnose a patient, without more, does not amount to an Eighth Amendment claim. *See Hughes*, 931 F.2d at 428. There is no indication in the record that Ms. Anders deliberately or even recklessly read or transcribed Plaintiff's results incorrectly. Nurse Anders did explain that, when she checks the results of tuberculosis tests on the cell block, she records the results for each inmate in a list and then transfers those results into the correct medical records in the medical unit. (Anders Dep. 45:2–10.) Thus, she acknowledges, it is possible that a result could be incorrectly recorded. (*Id.* at 45:15.) At most, however, this raises the possibility that Nurse Anders made an inadvertent mistake. Nurse Anders' alleged failure to accurately read or transcribe the result of Plaintiff's tuberculosis skin test may amount to negligence, or even gross negligence, but does not rise to the level of deliberate indifference actionable under the Eighth Amendment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[T]hat infection may occur and even isolated mistakes might

be made despite the procedures and reasonable care does not make the defendants liable under the Eighth Amendment."); *see also Morgan v. Sheahan*, No. 92 C 8455, 1993 WL 68068, at *1 (N.D. Ill. Mar. 10, 1993) (finding that a mistaken negative reading of a tuberculosis test did not amount to deliberate indifference).

In his deposition, Plaintiff asserted for the first time that no one read his tuberculosis test at all. Plaintiff's medical records from Stateville NRC show that Nurse Anders did read Plaintiff's tuberculosis test on December 7, 2015 and recorded a measurement of zero millimeters. The "validity of medical records and entries in medical records cannot be disputed in the absence of any contrary evidence." *Davis v. Ghosh*, No. 13 CV 4670, 2015 WL 3396805, at *3 (N.D. Ill. May 26, 2015) (citing *Johnson v. Hart*, No. 10 C 0240, 2011 WL 5509546, at *2 (N.D. Ill. Nov. 8, 2011)). Plaintiff has offered no evidence that Nurse Anders did not read his TB test; she herself testified that she has never falsified a medical record. (*See* Anders Dep. 40:5–17.) Even if the court assumes, for purposes of this motion, that Nurse Anders did not read Plaintiff's test, that assumption does not establish a genuine issue of material fact. First, there is no evidence that any alleged failure to read the test was a deliberate act, rather than a mistake or product or negligence. Second, an "individual must be personally responsible for a constitutional deprivation in order to be liable." *Childress*, 787 F.3d at 439–40. Plaintiff asserts in his response brief that "Nurse Anders was the only person who would have checked Mr. Johnson's PPD test" and was "the only person who could have alleviated his pain within days of his positive test result." (Pl.'s Resp. at 14.) He cites nothing to support these contentions, however, which do not appear in his Local Rule 56.1 Statement of Additional Facts. *See* N.D. Ill. L.R. 56.1. "[U]nsupported statements in a legal brief are not evidence that the [c]ourt can consider at summary judgment. *Boyce v. Obaisi*, No. 13 C 5746, 2015 WL 5462137, at *2 (N.D. Ill. Sept. 16, 2015) (citing *I.N.S. v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984); *United States v. Chapman*, 694 F.3d 908, 914 (7th Cir. 2012)). And "facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion." *Boyce*, 2015 WL 5462137, at *2 (quoting

*Beard v. Don McCue Chevrolet, Inc.*, No. 09 C 4218, 2012 WL 2930121, at *5 (N.D. Ill. July 18, 2012)). There is no basis in the record for the court to find that checking the results of tuberculosis tests administered during intake was the sole responsibility of Nurse Anders. Nor is there any indication that Nurse Anders was responsible for ensuring that all inmate tuberculosis tests were read. (*See* Anders Dep. 7:20–8:23 (describing her job responsibilities).) As a result, if Nurse Anders did not measure Plaintiff's response to the tuberculosis skin test, she was not personally responsible for the alleged constitutional violation and cannot be held liable under Section 1983 for violating Plaintiff's Eighth Amendment rights.

## IV.    Defendant Wexford Health Sources

Plaintiff claims that Defendant Wexford is liable for his injuries because it had a custom of employing underqualified medical personnel and failing to train or supervise those personnel.[12] (Pl.'s Resp. at 11.) As a result of this policy, he claims, he did not receive appropriate care for tuberculosis for four months. (*Id.* at 12.) Wexford Health Sources is a private corporation, but the parties agree that it acts under color of state law when it provides medical care at the Stateville NRC. (*See id.*; Aguinaldo & Wexford Mot. for Summ. J. [130] at 6.) As such, Defendant Wexford may be liable under § 1983 only if Plaintiff can meet the *Monell* municipal liability standard. *See Shields v. Illinois Dept. of Corrs.*, 746 F.3d 782, 789, 794 (7th Cir. 2014). This requires Plaintiff to demonstrate that Wexford's "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016)).

Importantly, recovery of damages against Wexford under a theory that it failed to train personnel or adopted a harmful policy ordinarily "requires a finding that the individual officers are

---

[12]    Plaintiff also asserts that Wexford had a custom of providing sub-standard care to inmates, but does not elaborate beyond that assertion. (Pl.'s Resp. at 11.)

liable on the underlying substantive claim." *Tesch v. Cty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) ("[A] municipality cannot be found liable if there is no finding that the individual officer is liable on the underlying substantive claim."); *see also Alexander v. City of S. Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (concluding that a municipality could not be liable under *Monell* for "a policy or custom of inadequately training and supervising its police officers . . . unless it violated a constitutional guarantee").  Because neither of the individual defendants violated Plaintiff's Eighth Amendment rights, Wexford cannot be liable for an alleged failure to employ qualified medical personnel or failure to train its employees.

There are some "unusual" circumstances in which "an organization might be liable even if its individual agents are not." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017). In such cases, the "institutional policies are themselves deliberately indifferent to the quality of care provided." *Id.* Wexford's training of medical staff on diagnosis and treatment of tuberculosis may well be questioned:  Dr. Aguinaldo and Nurse Hardy testified that they were never trained at Wexford to detect or treat tuberculosis (*see* Aguinaldo Dep. 84:12–14; 84:16-85:2; Hardy Dep. 17:18–18:6), and it appears from Dr. Fisher's deposition that responsibility for ensuring that Wexford employees understand and follow applicable IDOC policies is diffuse. (Fisher Dep. 24:6–25:8; 36:7–37:9.)  These inadequacies, however disappointing, do not support a finding against Wexford because its policy caused Plaintiff no injury.  *See Glisson*, 849 F.3d at 381 ("[T]he question whether Corizon had a policy to eschew any way of coordinating care is not the only hurdle plaintiff faces: she must also prove that the approach Corizon took violated her son's constitutional rights.").

Plaintiff also challenges Wexford's hiring practices, but the evidence does not support that challenge.  In a footnote, he refers to an expert report prepared for the case of *Lippert v. Godinez*, No. 13 C 1434, 2014 WL 540415 (N.D. Ill. Feb. 11, 2014), concerning Wexford's hiring and supervision practices in a separate unit at Stateville (*see* Pl.'s Resp. at 11 n.2; Fisher Dep. 14:9–

21; *see also* Aguinaldo Dep. 107:1–16), but the report is not in the record, nor does Plaintiff refer to it in his Local Rule 56.1 Statement of Facts. *See Boyce*, 2015 WL 5462137, at *2 ("[F]acts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.") And, as discussed above, Plaintiff has not shown that he was harmed by the delay in his medical treatment. *See Langston*, 100 F.3d at 1240. Nor has Plaintiff provided evidence supporting that the alleged delayed in treatment was a function of Wexford's alleged failure to train its employees or failure to hire qualified employees. Accordingly, summary judgment in favor of Wexford is appropriate.

## CONCLUSION

Plaintiff Johnson has failed "to make a showing sufficient to establish the existence of an element essential" to his case against each of the Defendants, and on which he bears the burden of proof. *See Celotex*, 477 U.S. at 322. Accordingly, Defendants Wexford, Aguinaldo, and Anders's motions for summary judgment [125, 126] are granted.

ENTER:

Date: January 28, 2020

REBECCA R. PALLMEYER
United States District Judge